Good afternoon, your honors. May it please the court. Alexi Haller, I'm appearing on behalf of defendant appellant Ryan Barry. I would please like to reserve three minutes for rebuttal. I am prepared to answer any questions that the court may have, but I would, if possible, like to start with the standard of review. This case presents an unusual, but not an unprecedented situation with regard to the standard of review. The defendant below moved to suppress all evidence seized at the apartment by the Los Angeles Police Department during its warrantless search, but the government, and not Mr. Barry, raised a specific probable cause issue raised on appeal, namely whether the LAPD officers had probable cause to believe that Mr. Barry resided at the Emilita Avenue apartment. This issue was actually decided by the district court, and under these circumstances, review is de novo. This is perhaps most clear from the Tenth Circus decision in United States v. Hernandez-Rodriguez, which is cited in the reply brief, but this court's decisions in United States v. Magdarella and United States v. Wayne, W-E-Y-N-E, also yield the same conclusion. It's a conclusion that makes sense, because a plain error rule is there to afford district courts the opportunity to resolve an issue in the first instance. Here, the district court not only had that opportunity, but actually did resolve the issue in the first instance, so de novo review is appropriate here. Now, the one case that the government cites in opposition to this is United States v. Santiago, but that case does not apply because it's not a search case. The government in that case did not raise the issue in the district court, and the district court did not resolve the issue, so it's inopposite in our view. What are you saying is the de novo review, the question of whether or not there's probable cause? Correct. But the factual, the facts underlying that are clearer. That's correct, Your Honor. Correct. And I don't think there's any dispute about the facts and, you know, on this record. Now, with regard to the merits, I wanted to note a couple things that were perhaps not as clear from the briefing. First, I would note that everybody below appears to have agreed that the reported address, the address reported to the probation department, was my client's parents' address in Santa Monica. So I just want to make that note. The district court referred to that on ER 96, and defense counsel referred to that on ER 212. And it's important to note that the reporting of this address as his address was not stale information. The record reflects that Mr. Berry signed the PRCS, post-release community supervision conditions, in mid-September 2018. That's at ER 172. Counsel, this is, is it possible for a person to have more than one residence? For example, I have an adult child, but I think she still considers our house to be home, but she lives somewhere else, which is her usual residence most of the time. So are these two things even fatally inconsistent? I think in theory it might be possible for somebody to have two residences, but I think that there would have to be probable cause to believe that this second residence here in Van Nuys on Emilita Avenue was also his residence. And I do not believe that cause exists here. Well, wasn't there some testimony that he recently moved into that apartment? That was after the search was over. So before the search, actually, if you look at all the information that the police had before December 10, 2018, all of that information points in the direction of him living in Santa Monica. The database searches that were conducted on December 4, 2018, showed that he lived in Santa Monica. The probation officer told the LAPD officer that he lived in Santa Monica, or he was from the Santa Monica unit that officer was. So really all indications prior to the search are that he resided in Santa Monica. Well, all indications up until the time of the tip that a person named Ryan driving a red Mustang convertible was selling drugs out of a particular apartment unit on Emilita Avenue, and so things evolved from there. So would you talk about that? Well, with all due respect, Your Honor, I don't believe that that does show that he was a resident there. The tip says that he was selling drugs out of the apartment. Oh, but more happened after that when they saw him, and they told him they wanted to search his apartment, and he didn't say, I have no idea or that's not my apartment, I'm visiting a friend or anything. I mean, I just have difficulties seeing that that conversation didn't in and of itself give them probable cause. Well, again, I think if you look here, all the evidence before that interaction was showing that he lived in Santa Monica, and then you have this interaction where he gives, at best, really a nonresponse to that statement. And I think that this is on all fours with the Granberry case, this court's decision in Granberry, where they basically told him, they told the defendant in that case, we're going to search your place now, and the defendant responded, do what you got to do. Right, which is not how this defendant responded. It seems to me quite different to say, do whatever you're going to do, which is a nonresponse. And when somebody says, does anyone else live there, if they're pointing to my house, I might say, you know, my husband and my dog. If they're pointing to my neighbor's house, I would likely say, not my house, or I don't know who lives there, or, you know, Jane and Sam live there. It wasn't a nonresponse. Well, that was as to where the girlfriend lived. And he did say, he didn't say, she also lives there with me, or I live there with her. He said that she lives there. No, but he responded to a question, who else lives there? And using a little common sense, if someone says about your house, who else lives there, you might say, my wife, my husband, my child, you know, I have a person renting a room. But that is a response that is implicitly agreeing, is it not, with the premise of the question that you live there and the else is someone else in addition. I think we're parsing words of this interaction that was right after his arrest. And I think that it's a step back. It's a step back, and you have to look again at, I think, what the officers knew, which is that he, before that interaction, all the information that they had was that he lived in Santa Monica. They didn't do any investigation of whether or not that was true. And the officer in this situation during this interaction with Mr. Berry could have said, well, how about this address in Santa Monica? Don't you live there? And he didn't. They didn't have to say anything different. But just looking at it from a common sense point of view, how people speak to each other, it seems that he lived there even before he gave them a key to the front door that worked on the front door. But the fact that that's why I started by saying you can have more than one residence, I think. So even if they had confirmed that he was still living with his parents some of the time, most of the time, I don't know how that necessarily detracts from probable cause here. Well, I do think that you have to look at the totality of the circumstances. And to me, the totality of the circumstances include all the information that they had that he was living in Santa Monica. And this court's decision in Granberry is very clear that the officers have to investigate that. They can't just sit back and then say, have this, what I consider to be an ambiguous interaction, say, well, now we have probable cause to believe he resides in the Santa Monica residence. Why wasn't all the questions he asked the proper investigation? Why isn't that? He asked them, are there weapons in the apartment? Is there dogs in the apartment? Where is the key to the apartment? That's an investigation. Those are questions and answers that are consistent with him selling drugs out of the apartment. They don't mean that he resided in the apartment. Those are two different things. And, again, I think the court in Granberry made that distinction very clearly. It said that just because you have probable cause to believe that he was selling drugs out of the apartment does not mean that you have probable cause to believe that he resided in the apartment. Now, I don't know if I only have one minute left out of the seven minutes. Okay, thank you. Can I ask a question? Maybe they'll put a little time on it for you. It seems to me that Granberry is the problem here. It's a straight case. There isn't any other case like it. And it's counterproductive to what we usually do. I was a district court judge, and when these people come out of jail, we let them out a little early. We have to keep that string on them or they're going to find some way to get away. Granberry interferes with that process. So it is kind of a stray case. If that's true, wouldn't we have some reason to reexamine Granberry? Well, I believe that Granberry is, as I stated in my brief, I believe it is controlling here. I believe that it's as on point as a case. I understand that. I understand that. And I think Granberry is a little different. Can we in some fashion say it's really an outrider and it's interfering with our administration of justice so we should look at it again? Well, my understanding is that that would have to come from the en banc court, right? But whether or not Granberry is worth revisiting I think is beyond the question here. I think the question here is whether Granberry is controlling, and I do believe Granberry is controlling here. I think it's rare that you have a case that on point in appellate practice, and it is one of those situations where you're surprised to find a case that close. And so I think it would be very tough to distinguish this case from Granberry, and it's very close on several matters, not only the failure to investigate the reported house but also the failure to investigate the Emilita Avenue house. They didn't do any surveillance, very minimal surveillance. They didn't check to see if he was taking out the trash, getting the mail, and all those things that were mentioned in Granberry. So I do think that Granberry is controlling here. We'll give you two minutes on rebuttal. Thank you, Your Honor. Good afternoon. May it please the Court, Jenna Long appearing on behalf of the United States. I want to pick up right where you left off, which is Granberry. And one of the important things here, though, is I first want to recharacterize and rather clarify something that's a little bit of an inflation. When my colleague is saying that there were repeatedly information about the Santa Monica address, that's not what the record bears out. Yes, it is true that the officers were aware that he had reported a Santa Monica address to his parole or probation officer. But there weren't the official and consistent reporting that Granberry speaks about. In Granberry, not only was it the parole address and repeatedly the parole address, it was also his DMV address in Granberry. We don't have that here. Instead, we have a single iterance of it being the reported address, and then we have on the day of the observations, which was, yes, limited because there was only one day of observations, that every other thing indicated that the Van Nuys or the Emilita address, that search department, was actually where the defendant was residing. And there's other significant differences from Granberry as well, one of which is the conversation that you've already gone into a little bit. It wasn't just a single question, and it's important to go back to exactly what Granberry says, which is that you're to consider the totality of the circumstances and the context and all of the things together. And that conversation alone would be sufficient because of how many different elements that conversation had. It started with the officers making it clear that they believed that he lived at the Emilita Avenue apartment because they said, we're going to search your apartment. That's different from Granberry where they said your place, which actually could have referred to the garage that wasn't even a residence at issue in Granberry. The next part was who else lived there. And, Your Honor, you already went into the significance of that, but the courts have already told us, including this court, we shouldn't look at conversations like legal technicians. We should use our common sense. And a regular person with regular caution would understand that exchange to mean that Mr. Berry lived there and that he lived there with his girlfriend. And the fact that he lived there with his girlfriend weighs against any finding that that Emilita Avenue apartment was just a drug stash house. Another fact that weighs against finding that that Emilita Avenue apartment was anything other than his residence is the fact that he specifically said his girlfriend was asleep on the couch. Not only is that a fact that the officers confirmed the moment they were inside the apartment before they went and searched the rest of the apartment, it also is a pretty common thing. It was 1 p.m. and it's a person taking a nap on their couch, a couch that she shared in a residence with Mr. Berry. Beyond that, Mr. Berry demonstrated additional familiarity about no weapons and no dogs. This would have been another natural time if a person who really wasn't sure about that apartment, if it was just, for example, say his girlfriend's apartment, he might have said that then. He might have said, I don't know. It's my girlfriend's place. I'm not sure. We're just staying there. And, Your Honor, I do want to address your question of can you live in two places at once. And I think it's, again, there isn't a bright-line rule, and it's a fair and reasonableness question here. But if you think about that, while there's no question under this court's precedent, you cannot just be an overnight guest. It's clear that Mr. Berry was treating this as his residence and that he felt that it was actually his residence. And I remind this court exactly what the court in Granberry told us. You can't cross-check factors. So we can't put the factors from Granberry up next to this case and just cross-check them for an answer because that's not what we're supposed to do in these. It's supposed to be a fact-intensive review. And a really good illustration of the importance of a fact-intensive review and the fact that just going one factor to another factor, one factor to the same, isn't good enough, is actually a case that was unpublished but recent with this court in 2020, which is United States v. Hopkins. And in that case, specifically, there were no observations of the defendant at the searched premises. There was consistent connections to a prior residence, not only of him previously living there, but his motor home, which could in and of itself be a residence, also registered at that prior address. In fact, when they went to the searched premises, a woman opened the door and denied that defendant living there. Those were all very significant things. That defendant didn't have keys that the officers were aware of to that residence. And yet, even under Granberry, the court in Hopkins found that the differences and the facts were significantly different enough that that still satisfied probable cause. Do you agree with opposing counsel that we are not free to overrule or change Granberry as a three-judge panel? I do, Your Honor. And so I think the important thing for Granberry is to do what it requires you to do, which is that totality-of-circumstances approach to make that fact-intensive review of this case because just this three-judge panel is not free to deviate or overrule Granberry. Well, even if we are bound by Granberry, do you think it was rightly decided? Your Honor, I would say that the facts in Granberry because of their differences don't dictate whether or not it was wrong or rightly decided in this instance because it isn't a direct comparison. Well, the one question I always had, why would the parolee have standing, Fourth Amendment standing, if he doesn't live there? Well, Your Honor, a person can create standing by being an overnight guest. Right. And it's my recollection, if it serves me well, that in Granberry, the later declarations by that defendant said that he had been an overnight guest of his girlfriend, that that was maybe his girlfriend's apartment. He had been staying there briefly and temporarily. And the parolee rules don't go to extend to wherever you stay overnight? Correct, because specifically in California, this kind of works like contract law, right? So in California, you actually sign conditions, and you're agreeing to those conditions when you get released early. And that condition is written by California, is that it's your residence, and so you need to reside there in order for that to be within. There is another caveat. The other caveat is property under your control, but it's my understanding that this court has not found that that applies to residences. So really here what we're talking about is, did they have probable cause to believe that he resided there? But that's another difference between Granberry and here. Mr. Berry maintains that it's his apartment, and in his post-arrest and post-search statement, in which he was also given his Miranda rights, he said as much, which he referred to actually when my colleague was speaking, that he said he had just moved in there, which also explains why there weren't that many database searches or other things connecting him to it. But those database searches and the surveillance of another address aren't required when it wasn't officially and consistently, specifically that consistently part, reported. And they aren't required when the evidence of his current residence is much more significant. Well, in Granberry, I think they said that even having a key is not evidence of residence. Do you agree with that part? If I may be a little more precise, Your Honor, Granberry specifically said that a key alone without anything additional is not enough. And I agree with that contention, saying just that you have a key isn't enough. But let's look at what we actually have here. He showed them the key, and he showed them the key after the officer said, so I don't damage the door. That not only is significant for his knowledge of the key, the possession of the key, one of many keys on the rest of his key chain, it's actually significant because it shows that he cared about that door not being damaged, which is frankly not consistent with your drug stash house. If the police search your drug stash house, do you really mind if that door gets broken down when you've just potentially found even more things? And facts like that, right? So the fact that he showed them the key, that the key was on his key chain, doesn't stand alone. It stands in the context and with that bigger conversation. It also stands in the context of those confirmatory details and taking together all of those facts, none of which are disputed. As my colleague even got up here and said in his argument before me, none of the facts are disputed. That's why there was no evidentiary hearing. That's why there's no evidentiary hearing needed now, despite the fact that my colleague has requested one, because there isn't a factual dispute here. And part of the reason there isn't a factual dispute is because this was completely ignored by Mr. Berry and his defense counsel in the district court when this was first actually talked about. We ultimately disagree with the government. The present record established probable cause, and we remand. Can Officer Eponizza testify to any additional information that might support the case? Well, Your Honor, me answering that wouldn't necessarily help you, since there isn't anything in the record that says that there are additional things. But I will say this. If there were additional facts that weren't actually part of the court's review, if something didn't get gotten into by the lower court at that level, it's because there was no challenge to this. It's because the defense had no questions about this issue. The defense didn't raise a single contention against any of the five factors that the government forwarded at the district court that supported probable cause. And they were invited to. And even though they were invited to by the district court, they still didn't address it. And I do see that I'm out of time, or rather just about out of time. No, I'm a couple seconds over. So if there's any questions otherwise, thank you for your time. Thank you. This is going to be tough to do in two minutes, but I'll try. So in terms of not official and consistent reporting of his address in Santa Monica, that's incorrect. It wasn't a single time. He said it to the probation officer, and also it appears twice on the database. So it was consistent. It was always Santa Monica. The difference between your apartment and your place, I don't particularly see a difference there. I think your place logically refers to your apartment. And in Granberry, I'm not going to read it, but on page 977, the court did refer to the garage, but then made it clear that it said more over and then made it clear that even if it was referring to the apartment, that it was an ambiguous response. And I think that applies here. Lived there with a girlfriend. Again, I think in my view the interaction was ambiguous, especially given the inconsistent statement or the statements in the past that he lived in Santa Monica. The girlfriend being a... Inconsistent if it was historical. Right. Sorry. The statements in the past that he was living in Santa Monica, I think that has to be taken with the statements at the time of the arrest. And I think at best it becomes a contradictory and ambiguous record that the police officer has to investigate. In terms of the girlfriend being asleep on the couch, I think that shows at best that the girlfriend lived there. That's Watts and Howard. That's not enough. Addition of familiarity with the weapons and the dogs. Again, that's consistent with him selling drugs out of the apartment, which is what the tip says. That doesn't go to residents. Can't cross-check factors. Well, that's exactly here. We've got all the facts basically line up with Granberry. So the totality of the circumstances, it's not picking and choosing. It's all of them pointing in one direction. The Hopkins case is unpublished, and it was a tip from a credible informant, the person's nephew. And the car was found in front of the house, and it was registered to the DMV. It says here that the key was shown to the officers, and Granberry was thrown. I don't really see the distinction there. And regarding the door not being damaged, that was not the case. There was nothing in the record that showed that my client was concerned about the door being damaged or not. He was concerned about his girlfriend not being woken up. And to answer your Honor's question, I do think that an evidentiary hearing could shed more light on this particular issue on appeal, and that's why we believe that evidentiary hearing is more important. But why? Could I ask a question imposing upon your time that's already gone? I'm just thinking ahead of what we might have to run into, and I wanted to get your thoughts, if you wouldn't mind. Do you think our court's probable cause analysis in Granberry is consistent with Supreme Court precedent? I do, Your Honor. Yes. Are you in a position to brief that if we need it? I would be happy to provide supplemental briefing on that question, Your Honor. Yes. Okay. Thank you. Thank you. I think that's it. Thank you very much, Counsel. This case is submitted, and we are in recess for today. All rise. The case is submitted.
judges: WALLACE, GRABER, BUMATAY